IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES MUNSON,                          )
                                       )
              Plaintiff,               )
                                       )
vs.                                    )         Case No. 18-cv-2216-DWD
                                       )
FAIYAZ AHMED,                          )
WEXFORD HEALTH SOURCES, INC.,          )
and WARDEN OF LAWRENCE                 )
CORRECTIONAL CENTER,                   )
                                       )
              Defendants.              )

<u>MEMORANDUM AND ORDER</u>

**DUGAN, District Judge:**

Plaintiff James Munson, an inmate in the custody of the Illinois Department of Corrections, alleges that Defendants Dr. Faiyaz Ahmed and Wexford Health Sources, Inc. were deliberately indifferent to his serious medical needs while he was incarcerated at Lawrence Correctional Center by denying his repeated requests for an MRI or an orthopedic referral for his chronic pain, in addition to Dr. Ahmed's performance of a biopsy without a numbing agent.  Plaintiff seeks monetary damages, proper medical treatment and a "full-body" MRI (Doc. 8). Defendant Warden of Lawrence Correctional Center was joined as a defendant in his official capacity for the sole purpose of implementing any injunctive relief that may be ordered.

Now before the Court are three Motions for Summary Judgment filed by Defendant Wexford Health Sources (Doc. 78), Defendant Faiyaz Ahmed (Doc. 82), and Defendant Warden of Lawrence Correctional Center (Doc. 85).   Defendants filed

supporting memorandum (Docs. 79, 83, 85).  Plaintiff responded in opposition (Docs. 89, 90), to which Defendants replied (Docs. 92, 93, 94).

### Factual Background

Plaintiff has been incarcerated with IDOC since 1993.  Plaintiff transferred to Lawrence Correctional Center on February 15, 2017 (Doc. 79-2, p. 6).  He transferred to Pinckneyville Correctional Center in July 2021 (Doc. 98).  Defendant Wexford contracts with the State of Illinois to provide certain medical services to IDOC inmates (Doc. 79-3).  Dr. Ahmed is a licensed physician whose employer, Consilium Staffing, is in a *locum tenens* relationship with Wexford, and was assigned to work at Lawrence as a physician from March 2017 to October 30, 2018 (Doc. 83-1, ¶¶ 1-2).

At his deposition Plaintiff testified that he was hit by a car twice when he was younger (Doc. 83-3, pp. 15, 22-24), and in 2014 he began experience more regular pain to his right knee and hip related to these accidents (Doc. 83-3, pp. 15, 22-24; *see* Doc. 79-1, pp. 129-30). Plaintiff also has had lower back pain for ten years (Doc. 83-3, p. 104). Plaintiff testified that he exercises daily for about 30-40 minutes a day (Doc. 83-3, p. 115). While at Lawrence, Plaintiff mostly performed calisthenics, stretching, yoga, and occasional jogging (Doc. 83-3, pp. 114-116).

The parties submitted over one hundred pages of Plaintiff's medical records from his time at Lawrence (Docs. 79-1, 83-2).  Plaintiff does not dispute the accuracy of his medical records (*See* Doc. 83-3, p. 26) (Plaintiff testified at his deposition that he had no evidence of IDOC falsifying any of his medical records).  Relevant to this dispute, the

Court will highlight the medical records related to Plaintiff's chronic pain and Plaintiff's biopsy of his testicular nodules performed by Dr. Ahmed.

When Plaintiff arrived at Lawrence in February 2017, a nurse conducted Plaintiff's intake screening (Doc. 79-1, p. 117). Plaintiff reported right knee pain (*Id.*). Plaintiff's transfer summary indicated that he had chronic conditions and was currently taking medications of Triumeq[1], Fibercon, Vitamin B Complex, Norvasc, and HCTZ[2] (Doc. 83-1; Doc. 79-1, p. 116). Non-party Dr. Shah reviewed Plaintiff's medical chart from his intake screening and renewed Plaintiff's medications, placed Plaintiff in the Hypertension Chronic Clinic, and ordered follow-up labs (Doc. 79-1, pp. 118-119).

On February 23, 2017, Plaintiff saw a nurse and complained of pain in his right knee and hip (Doc. 79-1, p. 120). Plaintiff reported that he was hit by a car at the age of 12 or 13 (*Id.*; *see also* Doc. 83-3, pp. 15, 22-24) and that the only medications that helped him were Flexeril[3] and Mobic[4] (Doc. 79-1, p. 120). The nurse provided Plaintiff with Acetaminophen and referred him to a physician (Doc. 79-1, p. 120). On March 3, 2017, Plaintiff saw a nurse for his knee pain and reported that he was supposed to have been given a knee sleeve when he was at Menard Correctional Center, but never received one (*Id.* at p. 121). The nurse indicated that Plaintiff did not have an order for a knee sleeve and told Plaintiff to continue his plan of care (*Id.*). Dr. Shah ordered Plaintiff a three-month permit for a knee sleeve and prescribed Mobic (Doc. 79-1, p. 40). In May 2017, Dr.

---

[1] Triumeq is a combination medication for treatment of Plaintiff's particular disorder not relevant to this dispute (Doc. 83-1, ¶ 8).
[2] Norvasc and HCTZ are used to treat high blood pressure (Doc. 83-1, ¶ 9).
[3] Flexeril is a muscle relaxant (Doc. 83-1, ¶ 13).
[4] Mobic is a NSAID (Doc. 83-1, ¶¶ 13, 15).

Ahmed ordered a medical permit for a knee support with an indefinite expiration date (Doc. 83-2, p. 246).

On June 22, 2017, Plaintiff saw Dr. Ahmed for complaints of pain in his right knee and thigh, and left foot pain from a past chemical burn (Doc. 79-1, pp. 129-30).  Plaintiff stated that Mobic was not "doing any good" and asked for Neurontin[5] (*Id*.).  Dr. Ahmed assessed that Plaintiff had right trochanteric bursitis, right iliotbial hand syndrome, right knee osteoarthritis, and left foot post burn neuralgia (Doc. 83-1, ¶ 23).  Dr. Ahmed prescribed a muscle rub for six months and Nortriptyline[6] for three months (Doc. 79-1, p. 130).

On October 5, 2017, Plaintiff saw a nurse again for his knee and foot pain (Doc. 79-1, p. 133).  The nurse gave Plaintiff Ibuprofen and instructed Plaintiff to return if his symptoms worsened or interfered with daily functioning (*Id*.). On October 22, 2017, Plaintiff saw Dr. Shah for complaints of nerve pain (*Id*. at p. 134).  Dr. Shah prescribed Cymbalta[7] (*Id*.).

On November 11, 2017, Plaintiff saw a nurse for "bumps" on his testicles (Doc. 79-1, p. 1).  Plaintiff testified that he had the bumps for years, and they were not painful but could bleed if Plaintiff cleaned himself too hard (Doc. 83-3, pp. 45-48).  The nurse observed no signs of bleeding, swelling or discoloration, but referred Plaintiff to a physician and instructed Plaintiff to return if his symptoms worsened or interfered with

---

[5] Neurontin is a nerve pain medication (Doc. 83-1, ¶ 23).
[6] Nortriptyline is a nerve pain medication (Doc. 83-1, ¶ 23).
[7] Cymbalta is a nerve pain medication (Doc. 83-1, ¶ 27).

daily functioning (Doc. 79-1, p. 1).  On January 4, 2018, Plaintiff saw Dr. Ahmed for the "bumps" on his scrotum, along with a cough, right knee pain, left foot pain, and because Cymbalta was "mess[ing]" him up (Doc. 79-1, p. 2).  Dr. Ahmed ordered a chest x-ray and labs, prescribed an antibiotic, and a follow-up appointment in four weeks (*Id.*). Plaintiff's chest x-ray came back normal (*Id.* at pp. 3, 87).

On February 13, 2018, Plaintiff saw Dr. Ahmed for his knee and foot pain, along with his "bumps" on his testicles (Doc. 79-1, pp. 4-6).  Plaintiff indicated that he stopped taking Cymbalta because it "mess[es] me up" and requested Gabapentin, and a refill of Vitamin B Complex and Fibercon (*Id.*).  Plaintiff also requested an STD test for his "genital warts" (*Id.*). Dr. Ahmed examined Plaintiff and observed no swelling of his right knee or left foot (*Id.*).  Dr. Ahmed performed the "McMurray test"[8], the "Lachman test"[9] and "valgus and varus stress tests"[10], which all came back as negative (Doc. 79-1, p. 5; Doc. 83-1, ¶ 32).  Dr. Ahmed assessed that Plaintiff has chronic right knee and left ankle pain (Doc. 79-1, p. 6).  He prescribed Gabapentin for 12 weeks, and renewed Plaintiff's Fibercon and Vitamin B Complex (*Id.*, at p. 4).  Dr. Ahmed also granted Plaintiff a low bunk permit and referred him to physical therapy for an evaluation of his right knee and left foot (*Id.* at p. 4; *see also* Doc. 83-2, p. 251).  Plaintiff received his low bunk permit beginning on February 13, 2018 (Doc. 83-2, p. 251).  Plaintiff was evaluated by physical therapy in April 2018 (Doc. 79-1, pp. 16-17).

---

[8] This test is used to detect meniscus tears (Doc. 83-1, ¶ 32).
[9] This test is used to diagnosis injury of the anterior cruciate ligament (ACL) (Doc. 83-1, ¶ 32).
[10] These tests are used to reveal instability to medial or lateral displacements within the knee (Doc. 83-1, ¶ 32).

On February 26, 2018, Plaintiff saw Dr. Ahmed again for his foot pain and "bumps" on his scrotum (Doc. 79-1, p. 7).  Plaintiff reported that he was still waiting for physical therapy and wanted an STD test (*Id.*).  Dr. Ahmed examined Plaintiff and observed a cluster of papular lesions on Plaintiff's scrotum (*Id.*)  Dr. Ahmed removed a lesion from Plaintiff's scrotum with a scalpel for biopsy and treated the wound with silver nitrate[11], triple antibiotic ointment and dressing (*Id.*).  Dr. Ahmed prescribed Nortriptyline[12] for six months, ordered a screening for hepatitis C, syphilis, and HIV, and a two-week follow-up (*Id.* at pp. 7-8).  The biopsy results indicated that the lesion was a mole (lentiginous junctional benign melanocytic nevus) (Doc. 79-1, p. 90; Doc. 83-1, ¶ 36; *see also* Doc. 83-3, p. 91).

Dr. Ahmed did not provide Plaintiff with a local anesthetic or other numbing agent before removing the lesion (Doc. 83-3, p. 83).  In his affidavit, Dr. Ahmed testified that he did not give Plaintiff a local anesthetic before removing the lesion because the lesion was small and could be quickly removed, within "a second or two", and an injunction with a needle to the biopsy site on Plaintiff's scrotum would have been painful, and could have damaged the architecture of the lesion, which might have compromised the biopsy results (Doc. 41-1, p. 6; Doc. 83-1, ¶ 35).  Plaintiff described the biopsy in his deposition, stating:

> That day I recall seeing Dr. Ahmed, Dr. Ahmed said that, "We're going to do a biopsy." No, his first thing was that he said, "We're going to cut on you." And I'm like, "What?" And he said -- He was laughing, and he said, "We're going to do a biopsy." And I said asked about doing a writ. He said,

---

[11] Silver nitrate is used to stop bleeding (Doc. 83-1, ¶ 34).
[12] Nortriptyline is a nerve pain medication (Doc. 83-1, ¶ 34).

"No, we're going to do it here." He called the nurse in, and he asked me to get on the table. I got on the table. I laid down. He asked me to pull my pants down. I did so. He said something to the nurse, I think this is Ms. Baker, told her to grab something. I think she went and got a vial of something that may have had a syringe in it from out of the cabinet. He said, "We're going to get this one," I believe. One moment, please. He said that he was going to numb me first. He said he was going to numb me first, then he said something to the point that, "We're going to get this one." Right away I felt a sharp pain, and I told him, "Wait a minute. It hurts. Hold on." He kept going or whatever. It lasted about maybe about -- The pain lasted it felt like about a good 45 seconds maybe, a little bit more. But as you know, when you're in pain, it seems like it's longer. So it was about 45 seconds. I asked him to stop. He kept going. When it was done, he said, "Are you all right now?" He gave me -- He put a Band-Aid on it and gave me one Band-Aid and I think some antibiotic ointment in small packets. That was it on that part. I went back to the cell house. He didn't give me any pain medication.

(Doc. 83-3, pp. 73-74).

Plaintiff also testified in his deposition that the biopsy site continued to bleed for three or four days after that biopsy, and that that he continued to feel pain for "quite some time", including sporadic incidents of pain for a few months thereafter (Doc. 83-3, pp. 78-79, 81-82). Plaintiff testified that he had two conversations with non-parties Dr. Pittman and Nurse Practitioner Stover about numbing agents, and Plaintiff stated that both non-parties advised Plaintiff that he could have been given numbing medication or a shot in his back before proceeding with the biopsy (*Id.* at pp. 86-88). Plaintiff does not recall whether he put in a formal sick call request related to his post-biopsy wound or pain but did have a discussion with a non-party nurse about receiving additional bandages (Doc. 83-3, pp. 82-83).

On March 16, 2018, Dr. Ahmed saw Plaintiff for a follow-up appointment (Doc. 79-1, at pp. 9-10). Plaintiff reported having dizzy spells in the prior 24 hours (*Id.*). Dr.

Ahmed noted that the STD test was negative for certain diseases, but positive for another disease not relevant to this dispute.  Dr. Ahmed examined Plaintiff and noted that Plaintiff's head, ears, nose, and throat were normal; there was no nystagmus; his lungs were clear; he had regular sinus rhythm; normal abdomen; his "Rombeg test" was normal; deep tendon reflexes were normal and symmetrical; Plaintiff could stand on each foot; Plaintiff had a fine tremor with outstretched hand; and his "Hallpike test"[13] was normal (*Id.*).  Dr. Ahmed assessed Plaintiff has having nonspecific dizziness, hypertension, and chronic knee pain (*Id.*).  Dr. Ahmed gave Plaintiff knee exercises to perform, referred him to an optometrist, ordered lab work, and ordered a four-week follow-up (*Id.*).

On April 13, 2018, Plaintiff saw Dr. Ahmed for a follow-up for his knee and back pain, along with a cough and occasional dizziness (*Id.* at pp. 12-14).  Plaintiff's blood pressure was 155/101 and 148/84 (*Id.*).  Dr. Ahmed noted that a prior x-ray from December 2016 of Plaintiff's knee was negative (*Id.*).  Dr. Ahmed examined Plaintiff, and his head, ears, nose, and throat were normal except for nasal congestion; his peak expiratory flow rate was normal; "Romberg's test" was negative; heel toe walk was normal; Plaintiff was able to stand on each foot for a few seconds; his lungs were clear; he had regular sinus rhythm; abdomen was normal; his low back was tender; his straight leg raise test was normal bilaterally; range of motion ("ROM") was normal; and Plaintiff had no neurovascular deficit. (*Id.*).  Dr. Ahmed's assessment was hypertension, allergic

---

[13] A "Hallpike test" is used to diagnose benign paroxysmal positional vertigo (Doc. 83-1, ¶ 37).

rhinitis (allergies), dizziness off and on, and chronic low back pain. (*Id.*).  Dr. Ahmed ordered a chest x-ray and an EKG and gave Plaintiff an exercise handout for his complaints of low back and knee pain. (*Id.*).  He prescribed hydrocortisone cream and increased Plaintiff's Norvasc[14] (*Id.*).  Plaintiff was to return for a follow-up in one week. (*Id.*).  Plaintiff's chest x-ray came back normal. (*Id.* at pp. 15, 88).

On April 18, 2018, Plaintiff was evaluated by physical therapy (*Doc.* 79-1, at pp. 16-17).  Plaintiff was assessed with normal range of motion and strength in his right knee and left ankle (*Id.*).  Plaintiff had minimal complaints of functional deficits (*Id.*).  The physical therapist determined that no skilled treatment was needed and suggested general stretching to Plaintiff prior to exercising or running (*Id.*).  The therapist educated Plaintiff on how to perform medial and lateral glides of his knee and Plaintiff demonstrated without difficulty (*Id.*).

On April 20, 2018, Plaintiff saw a non-party nurse practitioner for a follow-up on his chest x-ray (*Id.* at p. 18).  Plaintiff reported that he still had a dry cough, dizziness on occasion, and low back and knee pain (*Id.*).  Plaintiff requested an MRI for his knee and back (*Id.*).  The nurse practitioner observed that Plaintiff's chest x-ray was normal, his lungs were clear, and she prescribed Meclizine[15] and referred Plaintiff to Dr. Ahmed for his MRI request (*Id.*).

On April 26, 2018, Plaintiff saw Dr. Ahmed and requested an MRI for his back and knee (*Id.* at pp. 19-21).  Dr. Ahmed examined Plaintiff and observed no swelling of

---

[14] Norvasc is used to treat high blood pressure (Doc. 83-1, ¶ 9).
[15] Meclizine is a drug used to treat motion sickness/vertigo (Doc. 83-1, ¶ 42).

Plaintiff's knew and his range of motion was normal (*Id.*).  Plaintiff's "Lachman", "McMurray", and vulgus and varus stress tests were normal (*Id.*).  Dr. Ahmed observed that Plaintiff had no local tenderness, his straight leg raise test was still normal bilaterally, and Plaintiff had no neurovascular deficit (*Id.*).  Dr. Ahmed noted that "Patrick's" test[16] was negative (*Id.*).  Dr. Ahmed assessed Plaintiff has having chronic low back and right knee pain and ordered x-rays of Plaintiff's right knee and lumbar spine (*Id.*).  Dr. Ahmed instructed Plaintiff to continue his therapeutic exercises and to return for a follow-up in three weeks. (Doc. 79-1, p. 19).

On April 30, 2018, Plaintiff had x-rays of his right knee and lumbar spine. (*Id.* at pp. 22, 89).  The lumbar spine x-ray demonstrated minimal degenerative end plate changes at L5- S1 level. (Doc. 79-1, p. 89.).  There was no compression fracture, spondylolysis, or spondylolisthesis. (*Id.*).  Two views of the right knee demonstrated mild osteoarthritis without any acute bony fracture or dislocation and bony alignment was normal. (*Id.*).  On May 21, 2018, Plaintiff saw a non-party nurse practitioner for a follow-up to his x-rays. (Doc. 79-1, at p. 23)  She advised Plaintiff that the lumbar spine x-ray showed only minimal degenerative end plate change at L5-S1, and the right knee x-ray showed only mild osteoarthritis. (*Id.*).  The nurse practitioner explained that an MRI was not medically indicated, prescribed Naproxen[17] for six months, and referred Plaintiff to a physician to explain that an MRI is not medically indicated. (*Id.*).  Plaintiff believes that the nurse practitioner told him that he has a herniated disc (Doc. 83-3, p. 104), however,

---

[16] This test is used to identify the presence of hip pathology (Doc. 83-1, ¶ 44).
[17] Naproxen is an NSAID (Doc. 83-1, ¶ 46).

Plaintiff confirmed that the medical notes do not indicate this diagnosis (Doc. 83-3, pp. 124-25).

On May 31, 2018, Dr. Ahmed saw Plaintiff for back and hip pain (Doc. 79-1, p. 24). Dr. Ahmed's examination of Plaintiff's right knee and assessment was unchanged from prior evaluations (Doc. 79-1, p. 24). Dr. Ahmed's notes document that he engaged in lengthy counseling with Plaintiff explaining why MRIs were not medically indicated (*Id.*; Doc. 83-1, ¶ 47). Plaintiff's blood pressure was also 145/85, so Dr. Ahmed gave Plaintiff a hypertension patient education handout. (Doc. 79-1, p. 24). Plaintiff was to return for a follow-up in two weeks. (*Id.*). In Plaintiff's Complaint, Plaintiff stated that when he asked Dr. Ahmed for an MRI, he said that an MRI will not show anything that an x-ray would not show (Doc. 1, p. 7).

On June 14, 2018, Plaintiff saw Dr. Ahmed and requested an MRI because he was told he had degeneration. (Doc. 79-1, pp. 25-26). Dr. Ahmed's examination of Plaintiff's low back and right knee was normal except for minimal tenderness of the lower back. (*Id.*). Dr. Ahmed reviewed Plaintiff's labs and x-rays with Plaintiff and instructed Plaintiff to continue his therapeutic exercises. (*Id.*). On June 20, 2018, Plaintiff saw Dr. Ahmed again and reported that his leg and back still hurt. (*Id.* at pp. 27-28). Dr. Ahmed's physical examination of Plaintiff's low back and knee was unchanged. (*Id.*). His assessment was "perceived chronic" low back and right knee pain. (*Id.*). Dr. Ahmed reassured Plaintiff and instructed him to continue his therapeutic exercises. (Doc. 79-1, p. 27). Dr. Ahmed provided myofascial release therapy to Plaintiff. (*Id.*). Myofascial release

is a hands-on technique that involves applying gentle sustained pressure into myofascial connective tissue restrictions to eliminate pain and restore motion. (Doc. 83-1, ¶ 50).

On July 12, 2018, Plaintiff saw Dr. Ahmed and complained of his knee, thigh, low back, and cough and requested an antibiotic. (Doc. 79-1, p. 29). Dr. Ahmed's assessment was that Plaintiff's cough was from a viral respiratory infection and he did not need an antibiotic (*Id.*). On July 20, 2018, Plaintiff saw non-party nurse practitioner and reported that Naproxen was not helping. (*Id.* at p. 30). The nurse practitioner discontinued Naproxen and prescribed Tylenol 500mg and Robaxin[18] (*Id.*). Plaintiff saw the nurse practitioner again on August 9, 2018, to request an MRI or orthopedist referral (*Id.* at p. 31). Plaintiff reported that Tylenol and Robaxin were not working, and that he runs, does yoga, and gets regular exercise. (*Id.*). The nurse practitioner discontinued Robaxin and prescribed Tramadol[19] (*Id.*). The nurse practitioner determined that an orthopedist referral was not needed at that time, but that Plaintiff was to follow-up in six weeks (*Id* at p. 31).

On August 19, 2018, Plaintiff saw a nurse for his complaints of pain in his knee, thigh, foot, and back (*Id.* at p. 32). Plaintiff reported painful movement at times and having trouble getting into the top bunk. (*Id.*). The nurse charted that Plaintiff's low bunk permit expired and referred him to a physician. (*Id.* at p. 32). On August 23, 2018, Plaintiff saw a non-party nurse practitioner regarding a low bunk permit and expiring medication. (*Id.* at p. 33). The nurse practitioner issued a low bunk permit (*Id.*). On

---

[18] Robaxin is a muscle relaxer (Doc. 83-1, ¶53).
[19] Tramadol is an opioid pain medication (Doc. 83-1, ¶ 53).

August 23, 2018, Plaintiff was issued a low bunk permit that expired on August 23, 2019 (*Id*. at p. 112).   On September 20, 2018, Plaintiff refused a call pass to see a nurse practitioner for a follow-up of his complaints of knee and back pain. (Doc. 79-1, p. 34).

On November 23, 2018, Plaintiff saw a nurse for ringing in his ear, a sore in his nose, and his back and knee pain (Doc. 79-1, pp. 35-37).   Plaintiff was referred to a physician and saw a non-party nurse practitioner on November 27, 2018 (*Id*. at pp. 35-38). Plaintiff reported that sometimes he misses his morning dose of Tramadol and then the Tylenol is not enough for his leg and back pain (Doc. 79-1, p. 38).   The nurse practitioner refilled his hydrocortisone cream and prescribed drops for his ears. (*Id*.).

On February 26, 2019, Plaintiff saw the nurse practitioner again to request an MRI and air mattress for his back pain. (*Id*. at p. 39).   The nurse practitioner noted that she educated Plaintiff that an MRI and air mattress are not necessary. (*Id*.).   Plaintiff testified that he wanted an MRI to find out what was wrong with his knee, bone degeneration, and arthritis (Doc. 83-3, p. 118).   He claims that the MRI would show more than the x-ray findings (Doc. 83-3, pp. 127-28). Plaintiff also believes he needs a full-body MRI to look at whatever possibly could be wrong with him (Doc. 83-3, p. 180). Plaintiff confirmed in his deposition that no medical professional has told him that an MRI is necessary, however, he believes he needs an MRI because Plaintiff's family members and other inmates have told Plaintiff that an MRI would show if something was wrong, such as bone degeneration or bone cancer (Doc. 83-3, pp. 185-86). Dr. Ahmed testified that he did not believe that an MRI or other imaging was necessary based on his objective findings on physical examination of Plaintiff (Doc. 83-1, ¶ 60).

Plaintiff's pharmacy records also indicate that Plaintiff was consistently offered pain medications during the relevant time period at issue in his Complaint (*See generally*, Doc. 79-1, Doc. 83-1, Doc. 83-2; *see also* Doc. 83-3, pp. 147-152).

Plaintiff believes that Wexford had a policy to not allow MRIs and argues that Dr. Ahmed did not provide an MRI, not because it was his medical judgment, but because Wexford told him not to request MRIs because of their costs (Doc. 83-3, p. 132). However, in his deposition, Plaintiff clarified that Dr. Ahmed also stated that the MRI would not show anything different from the x-ray and that MRIs cost too much for it not to show anything (*see* Doc. 89, ¶ 22; *see* Doc. 83-3, pp. 140-141, 147-48).  Plaintiff also argues that Wexford has a pattern of not approving MRIs or orthopedic referrals because they cost too much money and Wexford has a policy to employ financial incentives to save money at the expense of inmates' well-being (Doc. 89, ¶ 23; Doc. 83-3, p. 173).  In support of this argument, Plaintiff points to his conversations with Dr. Ahmed and non-parties Dr. Pittman, and Nurse Practitioner Stover to show that Plaintiff was denied referrals for MRIs and orthopedic specialists (Doc. 83-3, p. 173).  Plaintiff also contends that other inmates have been referred to for an MRI but only because they sued Wexford to obtain a referral (Doc. 83-3, p. 172).  In his response (Doc. 89), Plaintiff supplied affidavits of five inmates at Lawrence who testified about their medical care at Lawrence:

Inmate Willie Harper testified that he has various medical conditions, including arthritis in his hip, back, and leg, yet for many years, doctors at Lawrence and Wexford have denied his requests for MRIs or orthopedic referrals because of cost (Doc. 89, p. 40). Inmate Johnny Tisley also testified that he has chronic back pain, osteoarthritis and

14

degenerative back disease, but that Dr. Shah and Dr. Ahmed have denied his request for an MRI or to see a specialist because MRI's cost too much (Doc. 89, p. 41). Inmate Maurice Jackson testified that he has severe muscle pains and spasms, and stomach pain, and that Dr. Shah has a pattern of discontinuing pain medications and refusing to treat chronic pain conditions (Doc. 89, p. 42). Inmate Kyron Murdock testified that he has chronic hip pain and waited over one-year to have an MRI taken (Doc. 89, p. 43). Following his MRI and after being seen by an orthopedic specialist, Murdock stated that he has not been receiving effective pain treatment and has not received any follow-up treatment because of Wexford's policy, practice, or custom, of delaying treatment and access to off-site specialists to save costs (Doc. 89, pp. 43-44). Inmate Jason Shewmake testified that he has serious medical problems, including an incurable bone disease which causes tumors to grow and replace his bones (Doc. 89, p. 45). This condition requires preventative CT or MRI scans every 6-8 months to determine whether removal is required (*Id.*). Shewmake claims that he must "beg" to receive these scans, and that they are often delayed or denied, although he has been approved for MRIs (Doc. 89, pp. 45-46).

### Legal Standards

I.   **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. PROC. 56(a)). A genuine issue of material fact remains "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II.     Deliberate Indifference to Serious Medical Needs

The Eighth Amendment prohibits cruel and unusual punishments, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm" — not to demand specific care, or even to receive "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (citation omitted).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750; *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (citing *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir.2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Farmer v. Brennan*, 511 U.S. 825, 828 (U.S. 1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653.  The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it.  *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Hammond*, 123 F. Supp. 3d at 1086 (stating that "isolated occurrences of deficient medical treatment are generally

17

insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did," *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *See Berry*, 604 F.3d at 441.

## Analysis

Plaintiff's Eighth Amendment claims specifically concern: (1) a biopsy of his testicular nodules performed by Dr. Ahmed; and (2) his treatment for chronic pain in his knee, foot, and back.  Specifically, as to the biopsy, Plaintiff claims that Dr. Ahmed was

deliberately indifferent because of his failure to administer a numbing agent before removing the biopsy from his scrotum (Doc. 89).

As for his chronic pain, Plaintiff contends that Dr. Ahmed was deliberately indifferent because he consistently refused to give Plaintiff pain medications and would not order an MRI or refer Plaintiff to an orthopedic specialist, and instead told Plaintiff he was "just getting old." (Doc. 89, ¶ 21; *see also* Doc. 83-3, pp. 140-141, 147-48). Related here, Plaintiff argues that Dr. Ahmed refused to place a referral for an MRI or orthopedic specialist because (1) the MRI would not show anything different from the x-rays, (2) because Wexford said not to, and (3) because it costs too much for it to not show anything (Doc. 89, ¶ 22; *see* Doc. 83-3, pp. 140-141, 147-48). Plaintiff claims this shows that Wexford had an unconstitutional practice or policy to employ financial incentives to save money at the expense of inmates' well-being (Doc. 89, ¶ 23). Plaintiff also argues that Wexford has a pattern of not approving MRIs or orthopedic referrals because they cost too much money and cites to his conversations with Dr. Ahmed and non-parties, Dr. Pittman, and Nurse Practitioner Stover (Doc. 83-3, p. 173), as well as conversations Plaintiff had with other inmates who have allegedly been unable to obtain MRIs (Doc. 83-3, p. 172).

Defendants argue that Plaintiff's medical needs are not serious medical needs within the purview of the Eighth Amendment. At this stage, however, the Court finds that a reasonable jury could conclude that Plaintiff had objectively serious medical needs concerning his chronic knee, back, foot and hip pain. Nevertheless, even assuming that all of Plaintiff's alleged needs are serious medical needs, there is no evidence of deliberate indifference here.

### 1.    Dr. Ahmed

Dr. Ahmed argues that he is entitled to summary judgment because he was not deliberately indifferent to Plaintiff's serious medical needs.  Instead, Ahmed claims that he exercised his professional judgment to propose a treatment plan that would provide Plaintiff with the best results and that Plaintiff disagreed with this treatment plan. The Court agrees.  In assessing claims of deliberate indifference, a medical professional's judgment regarding treatment decisions is entitled to deference "unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). A delay in treatment can rise to the level of deliberate indifference if the plaintiff presents medical evidence that the delay "exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-778 (7th Cir. 2015) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) and *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)).

As for Plaintiff's chronic pain in his knee, foot, and back, and alleged osteoarthritis, degenerative bone disease, and herniated disc[20], Dr. Ahmed met with Plaintiff on at least twelve occasions (Doc. 83-1).  During these encounters, Dr. Ahmed listened to Plaintiff, examined him using multiple diagnostic tests, and observed that Plaintiff had chronic pain.  Dr. Ahmed ordered pain medications, physical therapy, and x-rays.  He also explained multiple exercises Plaintiff could do to lessen his pain, including "myofascial

---

[20] Plaintiff believes he has a herniated disc; however, this contention is not supported by his medical records.  Even assuming that Plaintiff does have a herniated disc, the undisputed evidence in this matter does not rise to the level of deliberate indifference here.

release" which is a hands-on technique that involves applying gentle sustained pressure into myofascial connective tissue restrictions to eliminate pain and restore motion. (*See* Doc. 83-1, ¶ 50). The Court observes that Plaintiff was also provided a knee sleeve and a low bunk permit, and Dr. Ahmed placed an order for medical permit for a knee support with no expiration date (Doc. 83-2, p. 246). Further, when Plaintiff refused to take certain medications or reported that other medications were ineffective, Ahmed substituted or changed Plaintiff's prescription to other medications.

There is no evidence to support Plaintiff's contention that Ahmed disregarded an excessive risk to Plaintiff's health in treating Plaintiff's chronic pain. Ahmed exercised his professional judgment to determine a course of treatment for Plaintiff that included physical therapy, exercises, and medications, in addition to Plaintiff's knee sleeve and low bunk permit. Ahmed ordered x-rays and evaluated Plaintiff's range of motion and strength through the use of multiple diagnostic tests. Exercising his professional judgment, Ahmed concluded that Plaintiff had no medical necessity for an MRI or other imaging and would continue to treat Plaintiff's chronic pain issues through medications and exercises.

There is nothing in the record that calls into question Ahmed's professional judgment, and Plaintiff's disagreement with the treatment plan does not establish an Eighth Amendment violation. *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017); *see also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [Plaintiff] is not entitled to demand specific care."). Further, there is no evidence that Plaintiff's condition worsened because of the treatment he received from Ahmed or that

Plaintiff suffered any unnecessarily prolonged pain because of the treatment. In short, Ahmed's treatment plan is entitled to deference because it was not so unsuitable that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857.

Ahmed also did not disregard an excessive risk to Plaintiff's health by failing to refer Plaintiff for an MRI or orthopedic specialist. The record indicates that, Ahmed determined that an MRI care was unnecessary relying on his medical judgment. There is nothing in the record that indicates that an MRI or orthopedic specialist was necessary to treat Plaintiff's condition. Accordingly, there is insufficient evidence to suggest that Ahmed's displayed deliberate indifference by not referring Plaintiff for an MRI or specialist. While Plaintiff argues that Dr. Ahmed was not referring him for an MRI or specialist because of a Wexford policy or practice against such referrals, the record is clear that Ahmed did not believe an MRI was necessary or based on his medical judgment that an MRI would not show anything different from the x-rays.

Even assuming that Dr. Ahmed denied Plaintiff's requests for an MRI in part because of the costs of an MRI, this does not show deliberate indifference here. Dr. Ahmed asserted multiple reasons for denying the MRI, including that it was not medically necessary based on his physical examination of Plaintiff (Doc. 83-1, ¶ 60). In light of these reasons, the fact that cost may have also played into the analysis does not indicate deliberate indifference or a policy that requires denials of MRI based on cost alone. *See Roe*, 631 F.3d at 863 (administrative convenience and costs may be considered in making treatment decisions in appropriate circumstances, and so long as they are not

"considered *to the exclusion of reasonable medical judgment*") (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective.") (citations omitted) (emphasis in original)).

As for Plaintiff's biopsy of his testicular nodules, and Dr. Ahmed's decision to not provide a numbing agent or other measures prior to the biopsy, this too does not amount to deliberate indifference.  While Plaintiff claims that measures to alleviate pain might have been available to him, Plaintiff's disagreement with Dr. Ahmed's treatment does not establish an Eighth Amendment violation.  *Cesal*, 851 F.3d at 721; *Forbes*, 112 F.3d at 267 ("Under the Eighth Amendment, [Plaintiff] is not entitled to demand specific care.").  Nor does Plaintiff offer any evidence to show that a numbing agent or other measure was medically necessary.  Whereas Dr. Ahmed testified that he did not give Plaintiff a local anesthetic before removing the lesion because the lesion was small and could be quickly removed, within "a second or two", and an injection with a needle to the biopsy site on Plaintiff's scrotum would have been painful, and could have damaged the architecture of the lesion, which might have compromised the biopsy results (Doc. 83-1, ¶ 35).  Dr. Ahmed's professional judgment is entitled to deference here because there is no evidence in the record that it was so unsuitable that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857.

Moreover, although Plaintiff argues that he continued to feel pain after his biopsy for months, he does not argue, and the factual record does not support a finding, that Dr.

23

Ahmed was ever aware of Plaintiff's post-biopsy complaints. *See Thomas v. Walton*, 461 F.Supp.2d 786, 793 (S.D. Ill. 2006) ("Deliberate indifference 'implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it'") (internal citations omitted). Therefore, Plaintiff's claim here is related to the pain he felt during the biopsy, which Plaintiff states lasted for less than 1-minute. Considering the necessity of taking the biopsy, and Dr. Ahmed's medical judgment that a local anesthetic could have compromised the biopsy results, and reviewing the record as a whole, Dr. Ahmed's removal of Plaintiff's lesion without a numbing agent or other anesthetic here does not amount to deliberate indifference.

In sum, Plaintiff disagrees with Dr. Ahmed's medical judgment, but the evidence is insufficient to establish that Ahmed showed reckless disregard for Plaintiff's pain. Therefore, Plaintiff has failed to produce evidence showing that the treatment provided by Dr. Ahmed was so plainly inappropriate as to permit the inference that he intentionally or recklessly disregarded his medical needs. Dr. Ahmed is therefore entitled to summary judgment.[21]

## 2.    Wexford

Plaintiff's deliberate indifference claim against Defendant Wexford is premised on its alleged maintenance of a policy discouraging referrals for MRIs and to outside

---

[21] In addition to Defendant's arguments on the merits of Plaintiff's claims, Ahmed argues that he is entitled to qualified immunity. Because the Court has reached a decision in Ahmed's favor on the merits of Plaintiff's claims and concluded that the evidence does not create a genuine issue of material fact as to whether Defendant Ahmed violated Plaintiff's Eighth Amendment rights, the Court declines to reach this argument.

specialists. When a private corporation has contracted to provide essential government services, such as health care for inmates, the corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields*, 746 F.3d at 789; *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Accordingly, in order for Plaintiff to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Id.* at 796. He must also offer evidence showing that the policymakers were aware of the risk created by the custom or practice and failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010).

Defendant Wexford contends it is entitled to summary judgment because Dr. Ahmed was not deliberately indifferent to Plaintiff's medical conditions and, in any event, it did not have a policy or procedure that precluded Plaintiff from being referred for an MRI or to an outside provider. Plaintiff argues that he has submitted evidence to show that Wexford had a constructive policy of discouraging MRIs and outside referrals because of costs, and that this policy deprives him of appropriate medical care. He cites to his conversations with Dr. Ahmed, in addition to the affidavits from other inmates at Lawrence.

Plaintiff claims that Dr. Ahmed denied his request for an MRI because Wexford instructed him to do so on the basis of costs. However, Dr. Ahmed, also explained that an MRI was not medically necessary based on his professional assessment of Plaintiff's

conditions.  Another non-party medical provider similarly instructed Plaintiff that an MRI was not medically necessary.  Even assuming that Dr. Ahmed denied Plaintiff's requests for an MRI in part because of the costs of an MRI, this does not show deliberate indifference here because Dr. Ahmed also found that an MRI was not medically necessary based on his physical examination of Plaintiff.  *Roe*, 631 F.3d at 863 (administrative convenience and costs may be considered in making treatment decisions in appropriate circumstances, and so long as they are not "considered *to the exclusion of reasonable medical judgment*") (emphasis in original)).  Moreover, the affidavits supplied by other Lawrence inmates do not create a material dispute of fact or raise an inference of a Wexford policy to deprive inmates of medical treatment.  Indeed, some of the affiants actually received MRIs or other outside referrals.

Whereas, Wexford provided an affidavit of Joseph Ebbitt, the Director of Risk Management, HIPAA Compliance, and Legal Affairs for Wexford (Doc. 79-3), who testified that Wexford maintains a policy that physicians, physicians' assistants, and nurse practitioners employed by Wexford should use their best medical judgment, relying on their knowledge, skills, experience, and training, when ordering the treatment or medication that they believe is medically necessary (*Id.*).  Accordingly, the evidence at this stage shows that Wexford had a written policy calling for a case-by-case decision-making.  Dr. Ahmed maintains that he did not refer Plaintiff for an MRI or an outside specialist because he, personally, saw no verifiable medical evidence that called for such steps.  There is simply no competent evidence before the Court to show that there was a widespread custom that was the "moving force" of Dr. Ahmed's decision not to refer

26

Plaintiff for an MRI or for an orthopedic evaluation.  Without evidence to the contrary, no reasonable juror could conclude on the evidence currently before the Court that Wexford maintained an unconstitutional policy or custom that led to constitutionally insufficient medical care for Plaintiff.   Wexford is therefore entitled to summary judgment.

### 3.    Warden

Plaintiff does not bring individual claims against the Warden (Doc. 8; *see* Doc. 83-3, p. 181-82).  Instead, he seeks injunctive relief requiring an "all body" MRI.  The Warden argues that Plaintiff has not met his burden to show that he is entitled to an injunction or that an MRI is warranted here.  The Court agrees.  As detailed above, Plaintiff has not shown that an MRI is medically necessary.  Moreover, Plaintiff cannot meet his high burden for seeking a permanent mandatory injunction.

To secure a permanent injunction, Plaintiff must establish that (1) he has suffered irreparable injury; (2) the remedies available at law are inadequate to compensate him for that injury; (3) the benefits of granting the injunction outweigh the injury to the Defendants; and (4) the public interest would not be harmed by a permanent injunction. *See ADT Security Svcs Inc. v. Lisle-Woodridge Fire Protection Dist*., 672 F.3d 492, 498 (7th Cir. 2012) (citing *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003)).  The Seventh Circuit further instructs that mandatory injunctions – those that require an affirmative act by the defendant – like the one sought here, should be "cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

27

In the context of prisoner litigation, there are further restrictions on the courts' remedial power, circumscribed by the Prison Litigation Reform Act (PLRA). *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Under the PLRA, injunctive relief "must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Id.* (citations and markings omitted). This "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: 'Prison officials have broad administrative and discretionary authority over the institutions they manage.'" *Id.* (citation and markings omitted).

The undisputed material facts here indicate that an MRI or other referral has not been found to be medically necessary for Plaintiff. While Plaintiff disagrees, he does not dispute that no medical provider has indicated that an MRI is medically necessary. Prison officials are generally entitled to rely on the professional judgment of medical staff unless they have a reason to believe (or actual knowledge) that such staff "are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008). Accordingly, officials at Lawrence were entitled to rely on Plaintiff's current treatment plan, and Plaintiff has not met his burden to show that he is entitled to other medical treatment.

The Court is also not persuaded that the broad relief Plaintiff requests could be "narrowly drawn" within the parameters of the PLRA, even if the Court found he was entitled to injunctive relief. Plaintiff broadly seeks to receive a "full-body MRI" for diagnostic purposes without identifying any medically necessary reason for taking such

28

preventative health measures.  While Plaintiff maintains that he might have medically necessary reasons for using such diagnostic tools, at best Plaintiff's speculative course of treatment is likely underinclusive of potential treatment options that may be available to him.   Therefore, the facts do not justify such an extraordinary step of imposing a mandatory injunction and Defendant the Warden of Lawrence is also entitled to summary judgment.

### Conclusion

For the above stated reasons, Defendants' Motions for Summary Judgment (Docs. 78, 82, 85) are **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment in Defendants' favor and against Plaintiff James Munson and close this case.

**SO ORDERED.**

Dated:  March 11, 2022

_____
DAVID W. DUGAN
United States District Judge